UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-20672-CR-JORDAN

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

LAWRENCE PEREZ,

        Defendant.

_____/

## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court on (a) [Defendant Lawrence Perez's] Motion to Suppress Evidence Derived from Custodial Interrogation or *Garrity* Immunized Statements (D.E. 144) filed on August 12, 2011; and (b) [Defendant Lawrence Perez's] Motion to Suppress Intercepted Wire Communications (D.E. 146) filed on August 13, 2011. On October 20, 2011, these motions were referred to the undersigned for appropriate proceedings by the Honorable Alberto Jordan pursuant to 28 U.S.C. §636(b).[1] Accordingly, the undersigned conducted a hearing on these motions on November 3, 2011. Based on the evidence and facts as found herein, and following careful review of the affidavits submitted by the government in support of the subject Title III wire communications, and

---

[1]The Court also referred Defendant's Motion for Production of *Brady* and *Giglio* Material and for Access to Original Evidence for Forensic Examaination (D.E. 145) filed on August 13, 2011. The government's response indicated that most but not all of the requested items had been produced to defendant or do not exist. A court order from the undersigned was entered on November 18, 2011 resolving the remaining disputed items.

applicable law, the undersigned recommends:

a.    that Defendant's Motion to Suppress Evidence Derived from Custodial Interrogation or *Garrity* Immunized Statements (D.E. 144) be DENIED; and

b.    that Defendant's Motion to Suppress Intercepted Wire Communications (D.E. 146) be DENIED.

## FINDINGS OF FACT[2]

On or about September 3, 2011, Police Chief Van Toth of the Hialeah Gardens Police Department learned of a narcotics investigation being conducted by the FBI which involved defendant, Lawrence Perez, a detective on the Hialeah Gardens Police Department.  Chief Van Toth was told that defendant was to be arrested by the FBI; and he agreed to assist in defendant's arrest for safety reasons.

On September 10, 2010, Chief Van Toth and defendant drove together to the FBI office on the "ruse" that defendant was to be part of an FBI joint task force.  Upon arrival, Chief Van Toth suggested to defendant that they put their firearms in the trunk of their police vehicle to make it easier to pass through security in the FBI building.  Chief Van Toth and defendant then entered the building where Chief Toth met with two FBI agents waiting in the lobby.  Defendant was greated by two other FBI agents who escorted him upstairs.  Chief Toth had never instructed defendant to give any statements to the FBI or to

---

[2]These factual findings are based on the testimony of Hialeah Gardens Police Chief Van Toth, FBI Agents Paul J. Wright and Freddy G. Ortiz, and Defendant Lawrence Perez who all testified at the suppression hearing.  The Court also received into evidence the Advice of Rights form signed by defendant and a consent to search [cell phone] form also signed by defendant at the subject interrogation.

cooperate with the FBI agents by answering any of their questions. Nor did Chief Toth tell defendant anything concerning the FBI investigation or his impending arrest. Importantly, Chief Toth did not threaten or tell defendant that his employment as a Hialeah Gardens Police Officer would be terminated if he failed to cooperate with the agents.

Special Agents Paul J. Wright and Freddy G. Ortiz met defendant near the front entrance of the FBI building and walked with him to an interview room. Once inside, defendant was told that he was under arrest on narcotics charges contained within a federal indictment, handcuffed, and advised of his constitutional rights from an advice of rights form. Defendant was read each right from the form after which he placed his initials by each right and signed the consent portion of the form acknowledging that he had read his rights, understood them, and was willing to answer questions without a lawyer present. Defendant also gave consent for the agents to answer his cell phone should it ring during the interview. Both FBI agents witnessed defendant's signature on the consent forms and noted that defendant signed the rights form at 8:44 a.m.

Defendant was then questioned by the two agents over the next two hours. Defendant was not told that he was required to cooperate or answer any questions as a condition of his employment with the Hialeah Gardens Police Department. No police officer from his department was ever present during the interview. Defendant appeared calm but curious and possibly "shocked" at the time. Defendant was not questioned in any manner prior to the administration of his rights and his signing the consent form indicating his willingness to speak without an attorney.

During defendant's interrogation, a number of recorded telephone conversations were played which were obtained pursuant to court authorized interception orders.

Defendant was willing to answer questions about these conversations and a confidential informant used during the investigation. Defendant continued to answer all questions until the name of a female friend was mentioned by the agents. Defendant then terminated the interview and he was fingerprinted and booked on charges contained in the indictment.

Defendant had been a police officer for five years at the time. Defendant had participated in many arrests ("hundreds") and post-arrest interviews so that he was very familiar with arrest procedures and a defendant's constitutional rights. Defendant recalls being advised of the federal indictment soon after entering the interview room and his being frisked against a wall of that room. Defendant felt that he was being "tested" by the FBI agents or "initiated" by them as a new member of the task force. Defendant became concerned as the questioning progressed but he continued to answer all questions in order to make his "department proud of him." Defendant felt like he could have left the interview room, at least until he was handcuffed, but he did not do so because it might make his department or chief "look bad" and possibly affect benefits he received as a detective on his department. Defendant acknowledged, however, that he was never directly threatened with termination or discipline by his department if he failed to cooperate with and answer questions of the FBI agents.

## ANALYSIS

A. Motion to Suppress Evidence Derived from Custodial Interrogation

Defendant, a five year law enforcement officer with a local police department, moves to suppress statements he made during custodial interrogation on the grounds that such statements were obtained in violation of the Fifth Amendment pursuant to *Miranda v.*

*Arizona*, 384 U.S. 436 (1966); and/or compelled pursuant to "police job requirements" the use of which is precluded by *Garrity v. New Jersey*, 385 U.S. 493 (1967).   In brief summary, defendant argues that he was questioned by the FBI agents while working as a police officer for the Hialeah Gardens Police Department as part of a "ruse" participated in by his police chief so that he responded to FBI questions as an "obligation of his employment" and without *Miranda* warnings being administered or his rights waived prior to the interrogation. Thus, defendant argues that his Fifth Amendment rights were violated so that all statements he made and any evidence derived therefrom must be suppressed in this case.

### 1. No *Miranda* Violation

Reviewing the facts, as stated above, the undersigned finds no merit to defendant's contention that he was interrogated without first being advised of his constitutional rights pursuant to *Miranda*.   FBI agents Paul Wright and Freddy Ortiz both testified that defendant was escorted to an interview room where he was immediately informed that he was under arrest on charges contained within a federal indictment, handcuffed, searched and then fully informed of his *Miranda* rights using an advice of rights form which defendant initialed and signed in their presence.   Agent Wright testified that these procedures were done only a few minutes after defendant was arrested and before any questioning by the agents.  Agent Wright filled out the top portion of the advice of rights form and noted the time (8:42 a.m.) on the form.  Both agents then witnessed defendant's signature on the form and placed there own signatures there as witnesses at 8:44 a.m.  The undersigned finds no reason to question the credibility of either FBI agent or to credit defendant's

conflicting testimony that he was not read his rights until after the interview. Moreover, defendant, a police officer with five years experience, was fully familiar with arrest procedures and the constitutional rights of defendants. For these reasons, the undersigned finds no violation of defendant's Fifth Amendment rights based on an alleged failure of the agents to advise defendant of his rights prior to his interrogation.

2. No _Garrity_ Violation

Similarly, the undersigned finds no factual basis to support defendant's claim that his rights were violated under the _Garrity_ decision. In _Garrity_, the Supreme Court addressed the situation where law enforcement officers under investigation for criminal charges are questioned and given a choice to either incriminate themselves or to forfeit their jobs by refusing to answer on grounds of self incrimination. The Supreme Court found that any statements obtained from the officers under these circumstances violated the Fifth Amendment because the pressure on the officers to either forfeit their jobs or to incriminate themselves prevented a free and rational choice making any statement involuntary. _Id._ at 497-98.

The Eleventh Circuit has addressed the related situation where no direct threat of termination is made on an officer for failing to make an incriminating statement. In that instance, the Court must determine whether the police officer subjectively believed that he was compelled to give a statement upon threat of loss of his job, and whether such a concern was objectively reasonable at the time the statement was made. _United States v. Vangates_, 287 F.3d 1315, 1321-22 (11th Cir. 2002). As explained in _Vangates_:

> It is true, however, that _Garrity_ is more easily applied to situations "[w]here the state has directly presented the defendant with the Hobson's choice of

either making an incriminating statement or being fired," than to cases, such as this one, in which there has been no direct threat of termination. *See United States v. Camacho*, 739 F.Supp. 1504, 1515 (S.D. Fla. 1990). In the absence of a direct threat, we determine whether the officer's statements were compelled by examining her belief and, more importantly, the objective circumstances surrounding it. Thus, for her statements to be protected under *Garrity*, the officer "must have in fact believed [the] statements to be compelled on threat of loss of job and this belief must have been objectively reasonable." *United States v. Friedrick*, 842 F.2d 382, 395 (D.C. Cir. 1988). Put differently: "First, the defendant must have subjectively believed that he was compelled to give a statement upon threat of loss of job. Second, this belief must have been objectively reasonable at the time the statement was made." *Camacho*, 739 F.Supp. at 1515 (citing *Friedrick*, 842 F.2d at 395).

*Vangates*, at 1321, 1322.

In this case, defendant has established no facts supporting his claim of a *Garrity* violation. First, neither defendant nor any other witness testified that defendant was given a direct threat of termination if he failed to participate in the questioning of the FBI agents. At most, defendant felt that his failure to answer questions might make his own police department or chief "look bad" or somehow impact on certain of his benefits (use of automobile, phone allowance, etc.) received as a detective on his department. Thus, defendant has not established any subjective fear that he could have lost his job if he exercised his right to remain silent.

Moreover, defendant has failed to prove that any subjective belief he might have had about losing his job was objectively reasonable under the circumstances. The evidence establishes that defendant freely and willingly went to the FBI office with Chief Van Toth fully expecting to be considered for a joint task force position with the FBI. Defendant was clearly advised of his arrest, the charges against him, and his right to remain silent prior to any interrogation. Defendant freely chose to waive this right and to

answer the agents' questions believing that he was being "tested" by the agents as part of an "initiation" process. Defendant continued in this belief and did not become "concerned" until the questioning was repeated in several areas and his girlfriend was mentioned in the interrogation. Defendant then chose to conclude the interview. On these facts, the undersigned finds no objective basis to conclude that defendant feared termination of his employment as a police officer at any time during the interrogation.

Accordingly, the undersigned finds that defendant has failed to establish any Fifth Amendment violation as part of his interrogation at the FBI office that day.

B. Motion to Suppress Intercepted Wire Communications

Defendant also moves to suppress any intercepted wire communications obtained in conjunction with wiretap orders entered during the investigative stage of this case. Specifically, defendant challenges three orders entered by the Honorable Ursula Ungaro in mid-2010 arguing that the affidavits in support of the applications for those orders lacked probable cause to believe that "specific ongoing criminal activity" on his part was set forth in the affidavits. Defendants also argues that the wiretap orders were unlawfully obtained because the affidavits failed to meet the necessity and minimization requirements for wire tap interceptions under the Title III statute.

Evaluating defendant's arguments requires an examination of the three affidavits submitted in support of the subject interceptions. The initial order authorizing the wire interceptions of communications to and from two cellular telephones described in the affidavit was grounded on the affidavit of Special Agent Freddy G. Ortiz who participated in the investigation of this case. Agent Ortiz submitted his affidavit on May 28, 2010 resulting in the entry of the initial order authorizing wire interceptions of these two cellular

telephones used by Carlos A. Santurtun Teran ("Teran"). Agent Ortiz's affidavit detailed the investigation then underway of Teran, a known supplier/distributor of marijuana, who was believed to be a narcotics supplier to various drug traffickers in Florida and New York. Agent Ortiz identified several other persons ("target subjects"), including defendant Perez, who were known participants in Teran's narcotics organization. Defendant Perez was described as a detective with the Hialeah Gardens Police Department who had been recorded by an FBI confidential source discussing his willingness to make "bogus" traffic stops of suspected drug dealers in Florida, steal their narcotics and/or money, and split the proceeds with Teran and other target subjects. A telephone toll analysis resulting from a pen register and trap and trace device revealed numerous conversations between Teran and Perez on the subject cellular telephone lines (identified in the affidavit as TT1 and TT2) over the preceding months.

The remainder of the May 28 affidavit summarizes in considerable detail the information obtained concerning the criminal investigation of this organization using a confidential source ("CS1") who placed numerous recorded calls to Teran on both TT1 and TT2 and/or met with Teran and other targeted subjects and secretly recorded their conversations. The affidavit provides dates, locations, and participants of such contacts as well as a summary of recorded conversations and, where necessary, the agent's interpretations of words and phrases used during those conversations based on his training and experience with similar narcotics organizations. These recorded conversations provided considerable information to the issuing judge concerning Teran's narcotics organization, the frequency and amount of marijuana being sold by Teran and his associates to customers in both Florida and New York, the individual activities of the target

subjects in this organization, and other aspects of their criminal activity.  The affiant also noted surveillance by law enforcement officers outside of Teran's residence where meetings took place between Teran, CS1 and other target subjects.  Defendant Perez's participation in "planned traffic stops" and "rips" of drugs or drug monies was also reported based on Teran's recorded conversations with CS1.  The affidavit concludes with a call pattern analysis and toll analysis of over 9,000 telephone calls made to or from the subject cellular telephones between March 1 and May 25, 2010 in further support of the request for the wire interceptions of those telephone lines.  Finally, the affidavit outlines the alternative investigative procedures which had failed or had been used with only limited results (pen registers/trap and trace devices; controlled purchases of narcotics; physical surveillance; trash extractions; and other procedures) which had not been successful in revealing the number and identity of all participants in this criminal activity and the full scope of this drug network's activities.

Reviewing the wire application and supporting affidavit, Judge Ungaro entered an order authorizing the interception of the wire communications to and from Teran's cellular telephones (TT1 and TT2) for a period of thirty (30) days; and subsequently two additional orders continuing those interceptions based on additional information provided in updated affidavits detailing the results of the initial wiretap order and progress being made during this continuing criminal investigation.

### 1. Probable Cause

Reviewing all three affidavits and the detailed information provided therein, the undersigned finds clear probable cause for the issuance of all three wiretap orders challenged in this motion.  First, and importantly, defendant appears to challenge the

probable cause finding of the court based on an alleged "lack of probable cause" to believe that he personally was engaged in criminal activity rather than legitimate law enforcement conduct as a police officer. While this may be defendant's position at trial, it is completely aside from and irrelevant to the issue of whether there was probable cause to believe that particular conversations on the subject telephone lines "will be obtained through such interception... [and] ... that the facilities from which [ ] electronic communications are to be intercepted are being used ... in connection with the commission of [the requisite federal offenses as articulated in §2516]." 18 U.S.C. §2518 (3)(b) and (d). Stated simply, the probable cause determination here focused on the entire criminal organization under investigation and its suspected use of TT1 and TT2 to further its criminal activities and not on defendant Perez alone and his particular activities.

Properly viewed in this way, the detailed information contained in the May 28 affidavit, as summarized above, clearly met the probable cause requirement of the statute. The government correctly notes that an application for a wire tap authorization must be supported by the same probable cause necessary for a search warrant. *United States v. Nixon*, 918 F.2d 895, 897 (11th Cir. 1990); *United States v. Hyde*, 574 F.2d 856, 867 (5th Cir. 1978). The issuing judicial officer is to make a "practical common-sense decision" about whether the "totality of the circumstances" indicates that there is probable cause that the sought for evidence will be obtained. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The standard for review of a probable cause determination is "simply to ensure that the [issuing judicial officer] had a substantial basis for conclud[ing] that probable cause existed." *Id.* at 238-39.

Here, there was ample probable cause to support issuance of the initial wire tap order on the two targeted telephone lines; as well as for the continuation of those interceptions for two additional thirty (30) day periods thereafter.  The first affidavit relied largely on consensually recorded telephone calls placed by or to Teran by the confidential source working with the FBI.  The two supplemental affidavits relied on the information contained in the initial affidavit as well as the results of the first wire tap order in recording conversations in furtherance of the criminal activity under investigation.  In short, the probable cause requirement has been met in this instance.

## 2. Necessity

Defendant also challenges the wiretap orders on the ground that the affidavits in support of the applications failed to show a necessity for the wire interceptions.  Defendant argues that the law enforcement team had successfully introduced a confidential source ("CS1") into the Teran organization who was "more than capable" of meeting law enforcement needs, and that pen registers and trap and trace devices had already identified the co-conspirators at the time the wiretap order was requested.  Defendant argues that the law enforcement officers must show that traditional investigative methods were first tried without success or that alternative methods would not succeed if tried.  Here, defendant contends, the normal procedures used by the investigators "were exceedingly successful" without any satisfactory explanation of "retroactive or prospective failure" of other ordinary investigative techniques.

Defendant is correct in asserting that a wiretap application must met the "necessity" requirement of the statute.  Specifically, Title III requires a wiretap application to include "a full and complete statement as to whether or not other investigative procedures have

12

been tried and failed or why they reasonably appeared to be unlikely to succeed if tried or too dangerous." 18 U.S.C. § 2518(1)(c). Electronic interceptions are not permitted if "traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n. 12 (1974). Ordinarily, the government cannot meet the necessity requirement simply by informing the court of the investigating agents' conclusions that normal investigative techniques would be unproductive. *United States v. Ashley*, 876 F.2d 1069, 1072 (1st Cir. 1989). However, the affidavit need not show a comprehensive exhaustion of all possible techniques, but rather explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves. *United States v. Alonso*, 740 F.2d 862, 868 (11th Cir. 1984), *cert. denied*, 469 U.S. 1166 (1985). Reviewing courts should be sensitive to the reality that the quantum of evidence "sufficient to obtain a conviction is an imprecise concept." *United States v. Nixon*, 918 F.2d at 901. As a result, "[c]ourts will not invalidate a wiretap order simply because defense attorney's are able to suggests *post factum* some investigative technique that might have been used and was not." *Hyde*, 574 F.2d at 867.

Reviewing the three affidavits here, the undersigned finds that the law enforcement officers investigating this organization met the necessity requirement for all three wiretap orders. Agent Ortiz's initial wiretap affidavit was based largely on information obtained from CS1 who had engaged in numerous conversations with Teran and certain of there targeted individuals, including Perez, by telephone or during meetings attended by the confidential source. In addition, the initial affidavit relied on the results of pen registers, trap and trace devices, and limited surveillance to identify the targeted subjects and certain

13

of their criminal activities.  Despite the success of these "normal" investigative methods, the investigating officers realized (and explained) that they were unable to determine the full scope of the narcotics organization under investigation and still lacked critical knowledge concerning other members of the organization; their roles in supplying, selling and transporting contraband; assets used to facilitate and fund the drug trafficking network; and the money flow created by their criminal activity.  The government correctly notes that the Eleventh Circuit had held that the cooperation of an informant does not necessarily negate the need for electronic surveillance.  *United States v. Messersmith*, 692 F.2d 1315, 1317 (11th Cir. 1982).  Moreover, Agent Ortiz explained in his first affidavit that the confidential source (CS1), while initially able to communicate with Teran and certain other targeted defendants including Perez, lost such access due to a failed "rip" in late April 2010.  Agent Ortiz also explained why other traditional law enforcement techniques such as surveillance, trash pulls, controlled drug purchases, and attempted use of an undercover officer could not be effectively used in this case.  These explanations are more than conclusory statements of the affiant and fully satisfy the necessity requirement.

3. Minimization

Finally, defendant briefly argues that the wiretap affidavits were defective for failing to met the "minimization" requirement because the investigating agents failed to determine whether Perez was acting in a legitimate law enforcement capacity so that the minimization requirement was "*void ab initio*" with "no limitation on calls having an inherently lawful and valid purpose." Motion, pg. 5.  Defendant cites no specific conversations during which he was involved in legitimate law enforcement activities of his own, or any proof of his contention that he was doing so in this instance.  Defendant also offers no authority for his

summary challenge to the warrant affidavit on minimization grounds.  Reviewing the steps taken by the investigating agents to met the minimization requirement as explained in the government's response, the undersigned finds no minimization defect here.

## SUMMARY

For all of the foregoing reasons, the undersigned recommends:

a.    that Defendant's Motion to Suppress Evidence Derived from Custodial Interrogation or *Garrity* Immunized Statements (D.E. 144) be DENIED; and

b.    that Defendant's Motion to Suppress Intercepted Wire Communications (D.E. 146) be DENIED.

The parties may serve and file written objections to this Report and Recommendation with the Honorable District Court Judge Adalberto Jordan, within ten (10) days of receipt.  *See* 28 U.S.C. § 636(b)(1)(c); *United States v. Warren*, 687 F.2d 347 (11th Cir. 1982) *cert. denied*, 460 U.S. 1087 (1983); *Hardin v. Wainwright*, 678 F.2d 589 (5th Cir. Unit B 1982); *see also Thomas v. Arn.*, 474 U.S. 140 (1985).

RESPECTFULLY SUBMITTED at Miami, Florida this 15ᵗʰ day of November, 2011.

Ted E. Bandstra
United States Magistrate Judge

Copies furnished to:
Honorable Adalberto Jordan
All counsel of record